Faina P. v Alexander S. (2024 NY Slip Op 51469(U))

[*1]

Faina P. v Alexander S.

2024 NY Slip Op 51469(U)

Decided on October 21, 2024

Supreme Court, Kings County

Sunshine, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 21, 2024
Supreme Court, Kings County

Faina P., Plaintiff,

against
Alexander S., Defendant.

Index No. REDACTED

Brian D. Perskin, Esq.
Gabrielle H. Hagege, Esq.
Attorneys for Plaintiff
Alexander S., Esq. 
Defendant, pro se
Brad Nacht, Esq.
Court-Appointed Attorney for the Child

Jeffrey S. Sunshine, J.

The court is called upon to determine if the relationship between the parents has deteriorated post-judgment to such a level of acrimony as to render their parenting agreement for joint legal custody no longer in the best interests of the child and whether it is in the best interest of the child for the court to grant the plaintiff-mother's request for an of award sole legal custody while maintaining the current parenting time schedule where, inter alia:
• The father's belief that he is, because of his law school education and license to practice law, more capable to make decisions for the child than the mother because she works as an "office worker" despite his consent to joint custody in the parties' parenting agreement;
• The father commenced a plenary action against the mother alleging that she gave him herpes where he named her but kept his name anonymous and had her served publicly by his current girlfriend at the parties' child's soccer practice where the child was present;
• The parties have been unable to agree on issues of education, medical, and aspects of religious education but the father repeatedly and steadfastly refuses to comply with the parties' stipulation of settlement protocol for using a parenting coordinator when the parents are unable to reach agreement on a major decision despite the mother's repeated requests that they did so;
• The father interfering with the dental professional delineated in the stipulation of settlement resulted in extensive delays in health care treatments for the child while the mother attempted to comply with the father's shifting demands and continued refusal to use the parenting coordinator;
• The father refusing to pay his basic child support for more than a year because he represented, inter alia, he had new expenses related to the child he fathered with his girlfriend and his insistence that those expenses should, in effect, supersede his child support obligation to his first child which ultimately resulted in a judgment for child support arrears being entered against him;
• The father sued and/or filed grievances against each of the multiple attorneys who represented the mother alleging, inter alia, that it was malpractice for them to represent her because counsel fees were not in the child's best interest even where he stopped paying basic child support for more than a year designed to attempt to leave her without counsel;
• The father's agreement that the child enroll in a private school but later allegedly withdrawing his consent for the child to remain in that private school if he had to pay tuition but then filing an order to show cause seeking to hold the mother in contempt alleging that she was jeopardizing the child's enrollment in the private school if she did not pay for the entire tuition;
• The father's vehement disdain for the mother and lack of awareness of the value of maintaining the child's relationship with the mother;
• Additional interference with joint decision making as detailed herein.
This post-judgment trial was held on August 4, 2023; August 10, 2023; December 13, 2023 and March 28, 2024. The court heard oral summations on June 3, 2024. Transcripts of the trial dates were submitted on August 20, 2024 and the matter was marked decision reserve on that date.[FN1]

At trial, plaintiff-mother was represented by privately retained counsel; defendant-father appeared self-represented; and the child, who is nine (9) years old [December 2015], was represented by a court-appointed attorney.
Defendant Appeared Self-Represented
The Court made extensive records on each court appearance as to the right to counsel and the risks of proceeding self-represented, provided lists of referral panels and bar associations and [*2]information about the Office of Self-Represented. There were adjournments granted for defendant to seek counsel and he briefly retained counsel but subsequently discharged that attorney to once again represented himself. Thereafter, the court repeatedly offered the defendant opportunities to seek an adjournment if he desired to obtain legal counsel but defendant declined each time and represented on the record that he wished to represent himself.
The Court has found that the defendant, who is an attorney licensed to practice law in New York and who is employed as an attorney at a law firm, is not eligible for the assignment of counsel.
Defendant testified in the narrative on direct examination and cross-examined the plaintiff. The court, though acknowledging on the record the emotional nature of the proceeding, had to repeatedly direct the defendant to contain his cross-examination of plaintiff to testimony on direct examination noting that "it is not an opportunity for you to air all of your grievances with this witness [the plaintiff] . . . " [8/4/23, p. 173] and at other times took recesses for defendant to regain his composure.
From the beginning of the trial, the court had to direct the defendant — who repeatedly asserted his 14 years of experience as a trial attorney — not to attempt ex parte communications with the court through his mannerisms while the plaintiff was presenting her case, including directions that he not to laugh or point at plaintiff and to control his looks of dismay because such mannerisms were not appropriate in a court of law and laughing at an adversary on the record was not a proper part of the judicial process [8/4/23, p. 22]. Defendant asserted that the court misinterpreted his laughing.
Witness Testimony
The parties each testified, as did the following witnesses:
The child's home room teacher [Ms. K]: called by the defendant.
The child's pediatrician [Dr. S]: called by the defendant.
The paternal grandmother [Ms. S]: called by the defendant.
Defendant's friend [Mr. K]: called by the defendant.
Defendant, in lieu of calling them for testimony, attempted to submit affidavits from the child's pediatrician and homeroom teacher. Both plaintiff's counsel and the attorney for the child objected to these affidavits since the affidavits were not subject to cross-examination [8/4/23, pp. 8-10]. Defendant argued that calling them to testify and to be cross-examined would "waste" their time and argued that since he was calling these witnesses and not plaintiff there was no basis for plaintiff to insist that the witnesses be present for cross-examination. Defendant argued that plaintiff's insistence that these witnesses be available for cross-examination was "just more evidence in support of the defendant's case" that plaintiff was engaged in unnecessary litigation [8/4/23, p. 9]. The court denied the application pursuant to 22 NYSCRR 202.16 which provides that "testimony by way of affidavit on direct is not permitted in custody, visitation, or parenting cases . . . " [8/4/23, p. 10].[FN2]
To avoid unnecessary interference with the pediatrician and teacher's schedules the court, on consent of all parties, permitted these witnesses to appear via video conference for direct examination and cross-examination.
Procedural History
The parties were married in September 2012 and plaintiff commenced an action for divorce in August 2019. On November 12, 2019, the parties resolved the divorce action by executing a parenting agreement [NYSCEF #6] and a stipulation of settlement resolving finances and all ancillary issues between them [NYSCEF #7] — these stipulations were subsequently incorporated but not merged into a Judgment of Divorce signed on February 28, 2020 [NYSCEF #5]. An amended judgment of divorce was signed on June 2, 2023 [NYSCEF #554] and entered in the Office of the Clerk of the County of Kings on June 14, 2023 [NYSCEF #555] after motion practice and the Court granting leave to amend in a written decision dated March 30, 2023 (see Faina P. v. Alexander S., 78 Misc 3d 1225(A) [Kings Co., March 30, 2023]).
Pursuant to the parties' parenting agreement, which was incorporated into the judgment of divorce, the parties share joint legal custody of the one (1) child of the marriage with residential custody to the mother. 
For the full procedural history of this extensive and complex post-judgment litigation, the prior published decisions, including the April 18, 2022 [Faina P. v Alexander S., 75 Misc 3d 701; NYSCEF #101]; March 30, 2023 [Faina P. v. Alexander S., 78 Misc 3d 1225(A); NYSCEF #442]; and August , 203 [Faina P. v. Alexander S., 80 Misc 3d 1208(A) decisions, must be read in conjunction with this decision.
The post-judgment litigation between the parties started in December 2021 when plaintiff filed an order to show cause for contempt against defendant based upon his failure to pay any basic child support for over a year.[FN3]
The plaintiff explained the delay in filing the enforcement application was delayed due to a life-threatening accident involving the parties' son, which it is undisputed resulted in a traumatic brain injury. She asserted that defendant's unilateral choice to stop paying basic child support exacerbated the difficulties she faced due to the child's accident and, subsequently, her mother's battle with terminal cancer and death in April 2021. 
In response to plaintiff's enforcement action, defendant filed numerous applications seeking, inter alia, to retroactively "terminate" his child support obligation as previously agreed to between the parties on consent in their stipulation of settlement dated November 12, 2019 [NYSEF #7], to modify his basic child support and even seeking child support from the plaintiff on various theories including alleging that the plaintiff had an extramarital affair during the marriage that, he argued, warranted a post-judgment downward modification of child support even though defendant earns nearly double the income that plaintiff earns.[FN4]
He also filed [*3]numerous cross-applications seeking contempt against plaintiff for a litany of alleged contemptuous acts including, inter alia, not providing him enough access to the pet cat the parties shared during the marriage and for, he contends, violating the Jewish faith in seeking enforcement against him for non-payment of his basic child support obligation. In rejecting defendant's argument that plaintiff should be held in contempt for violating the parties' parenting agreement to raise the child in the Jewish religion because, he argued, it violated Jewish religious doctrine for her to seek enforcement of child support, the court found (Faina P. v. Alexander S., 78 Misc 3d 1225(A)):
Defendant, an attorney, in effect, argues that according to his interpretation of religious principals there could never be any enforcement proceedings of binding legal agreements — such as a stipulation of settlement — based on religious observance because it would ipso facto be contempt where the parties agreed to raise any children of the marriage Jewish: the Court wholly rejects this argument as it would nullify the strong public policy in favor of child support (see generally Fortgang v Fortgang, 170 AD3d 963 [2 Dept.,2019]).
In a written decision dated April 18, 2022, the court found the defendant in contempt [FN5]
for failure to pay child support and addressed each of defendant's allegations including finding that the plaintiff had not interfered in his access to a pet cat the parties shared during the marriage warranting contempt and that no finding of contempt against plaintiff was warranted for any of the allegation raised by defendant as defenses to his failure to pay child support (Faina P. v. Alexander S., 75 Misc 3d 701 [Kings Co., April 18, 2022]. The court noted that defendant conceded that he unilaterally stopped paying child support and instead merely offered excuses for that non-payment for a host of personal grievances against the plaintiff and by, seeking to modify his child support retroactively downwardly.
After the court found him in contempt in the April 18, 2022 decision, the defendant filed for leave to renew his application for a downward modification: this time seeking to modify his child support nunc pro tunc to the date of his initial non-compliance with the basic child support provision of the judgment of divorce.[FN6]
This court issued a written decision and order dated May 30, 2023 denying that application which included finding that, inter alia, the defendant actually [*4]earns more income than when the parties entered into the stipulation of settlement (Faina P. v. Alexander S., 78 Misc 3d 1225(A) [Kings Co., March 30, 2023]). 
Throughout this post-judgment litigation, plaintiff has been represented by private counsel at, she represents, enormous financial hardship to her. Plaintiff has filed an application seeking counsel fees pursuant to DRL 238 for counsel fees related to enforcement of the child support. Defendant has maintained that he should have no financial responsibility for any of plaintiff's counsel fees because, he contends, since she started the litigation by seeking enforcement and any counsel fees she incurred were, in effect, "voluntary" and are, in effect, not his financial responsibility. He has filed applications seeking that the plaintiff, the less-monied spouse, pay counsel fees to himself for representing himself.
There have been 17 post-judgment applications filed between these parties since December 2021 — less than three (3) years ago — when plaintiff filed the initial enforcement application against defendant. Most of these applications were filed by defendant seeking to "terminate" his child support and/or to avoid financial obligation for counsel fees related to the enforcement proceeding necessitated by his non-compliance.
In December 2022, plaintiff filed the order to show cause seeking a change of custody. In a written decision dated March 30, 2023, the court found that "plaintiff has raised substantial and specific allegations more than sufficient regarding her basis to seek a modification of the parties' custody agreement" and selected a date to hear oral argument on appointment of an attorney for the child [(Faina P. v. Alexander S., 78 Misc.,3d 1225(A)]. After oral argument and based on the allegations presented, including those raised by the defendant his numerous motions seeking contempt against plaintiff, this court appointed an attorney for the child by written order dated May 12, 2023. Initially, the defendant opposed the child meeting with the attorney for the child which this court addressed in the written order dated August 16, 2023 [Faina P. v. Alexander S., 80 Misc 3d 1208(A)]. 
Plaintiff-wife does not seek to alter the child's parenting time schedule with the defendant-father but to change the parties' parenting agreement from joint custody to an award of sole legal custody to her so that she has final decision making on major decisions including religion, education and medical given the defendant's refusal to consult with her or to utilize the parenting coordinator as agreed to by the parties in their parenting agreement.

 The Parties
The mother is 42 years old and worked for more than twenty (20) years for an office support chain in an office support capacity. The father is 40 years old and he testified that he graduated from law school in 2009 and has been licensed to practice law in the State of New York, New Jersey, Washington, D.C. and Connecticut for fourteen (14) years. He represented that he is a trial lawyer who does not focus on the practice of matrimonial law. 

 The Parenting Agreement
The parties' parenting agreement, dated November 14, 2019, provides extensive protocols for seeking input from various named professionals including the child's dentist, pediatrician and school and that if they are still unable to come to an agreement on any major parenting decision that they will meet with a specifically named parenting coordinator:
In the event the parties are unable to make decisions between themselves, and with respect to all Major Decisions, the Parties shall seek the assistance of a Parenting Coordinator, and shall cooperate with the suggestions of the Parental Coordinator in [*5]order to arrive at a mutual decision that is in the Children's best interest. The parties agree to the selection of Dr. [P. J. F.], with offices at REDACTED, as the Parenting Coordinator. If the Parenting Coordinator is unable to continue, the parties shall select an alternate within fifteen (15) days of the advisement that the Parenting Coordinator will not be continuing. In the event the Parties are unable to agree on a new Parental Coordinator, who shall be a licensed health professional/social worker, the prior Parenting Coordinator shall make the final decision.
g. The cost of the parental coordinator shall be shared by the Parties with the Father paying 50% of such costs and the Mother paying 50% of such costs. The cost of all other professionals set forth in this Stipulation to resolve disputes as to Major Decisions shall be shared by the Parties pursuant to the same 50% / 50% ratio.
h. If after meeting with the Parental Coordinator to discuss a disputed Major Decision, the Parties are unable to arrive at a mutual decision regarding a particular Major Decision, the Party whose opinion most closely reflects the opinion of the Parental Coordinator (or the replacement coordinator as selected in accordance with the procedure set forth above) shall make the final decision, subject to a Party's right to seek judicial intervention with respect to the Major Decision in dispute, which application shall be made within fifteen (15) days of a final decision.
Plaintiff testified that by June or July of 2020  just a few months after entering the parenting agreement  it became impossible to make joint decisions with the defendant because he refused to abide by the procedure in the parenting agreement for resolving disagreements on major decisions [8/4/23, p. 38]. She contends that the parties have never been able to make joint decisions. She testified that, instead of following the terms and protocols the parties agreed to in the parenting agreement and stipulation of settlement that were incorporated into the judgment of divorce, the defendant immediately began stonewalling her, using financial coercion and other retaliatory tactics, including "weaponizing" his legal education and license to practice law to force her to acquiesce to what he wants on major decisions without any regard for her opinions, the parties' parenting agreement or the impact on the child. She contends that defendant makes all decisions based on the financial impact to him even though, despite the disparity in the parties' incomes, the parties' stipulation of settlement provides that the parties will share equally (50/50%) any costs for things like private school, medical costs, and extracurricular activities.
Plaintiff contends that when defendant unilaterally stopped paying any child support to her in June 2020 that he also stopped communicating with her about major decisions. She testified on cross-examination by the defendant:
Q. So at what point are you claiming that these civil decisions, discussions stopped?
A I think around June 2020.
Q What happened in June of 2020?
A It was the beginning of Covid, and I received an e-mail from you saying that you are done with paying child support to me because of Covid. And then I tried to communicate with you about other issues, and you refused to communicate with me [8/10/23, p. 228].
Plaintiff testified that her experiences with defendant post-judgment show that "[h]e makes unilateral decisions without consulting me" [8/4/23, p. 69] and that "it is difficult in the future to make decisions where I feel like my opinion is not being listened to" [8/4/23, p. 70]. [*6]She testified that on major decisions when she has a differing opinion the defendant will not abide by the parenting agreement and instead retaliates against her:
" . . . I feel like I present sound reason to him, [sic] point by point. And he retaliates about court proceedings. And doesn't want to discuss the specifics, pluses and minuses for the school, or any plus or minus for any other school. It is just withhold consent, and vetoes any decision that I am trying to bring up" [8/4/23, p. 71].
Defendant testified in the narrative on his direct that there are no decision-making problems between the parties, that they "parallel parent" the child well, that there is no basis for the plaintiff to seek to change custody and that her seeking to do so is, in his opinion, evidence that she is not fit to make decisions for the child. He testified that the plaintiff has "no complaints about anything" he does with the child day-to-day so, he contends, she has no valid basis to alleged that they cannot continue to share legal custody [12/13/23, p. 61]; however, he also testified on direct (in the narrative) that he and the plaintiff have disagreed on every area of major decision making in the three (3) years since they divorced including on issues of education (private school vs. public school); medical (dental treatment/surgery timing/vaccinations); and even on aspects of religion (should the child attend Jewish enrichment opportunities). Defendant takes the position that while the parties have disagreed on major decisions that all disagreements were ultimately "resolved" because, after he refused to use the parenting coordinator and refused to discuss the issue with her, the plaintiff eventually went along with what he wanted so, he contends, there was no more disagreement.
During cross-examination by the defendant, the plaintiff testified that the parties have not been able to agree on much at all regarding the child either day-to-day or major decisions:
Q. Can you give me another example where there was some kind of a disagreement?
A We disagreed about camp.
We disagreed about what to do during, when my son was hit by a car accident.
We disagreed about, you know, swimming.
We disagreed about Russian lessons.
We disagreed about Hebrew school.
The list goes on and on.
There are minor ones, and there are big ones.
So I constantly feel that if I try to bring up a decision, I have to tippytoe around your moods that you will retaliate to me, and sue somebody. Or, you know, new motions. I don't know.
You sue practically everybody. Doctors. You know.
There is an example about where I have asked you, in our custody agreement there is a clause in there that the child will attend Hebrew school. I have asked you on numerous times to bring the child to Hebrew school, which I fully pay for. Fully pay out of my pocket. All you have to do is bring him there. It is in our custody agreement. You refused to bring him there. [8/10/23, pp. 2234-235]
Defendant, in addition to disputing that the parties are unable to reach agreements, testified that he does not believe that plaintiff has good judgement so she should not be granted sole legal custody. He makes this assessment of plaintiff, he testified, because she sought enforcement of his child support obligation which resulted in a finding of contempt against him [*7]without, he contends, considering how seeking enforcement may affect him and his new family:
I had a pregnant girlfriend at the time, about to give  seven months pregnant. It was a very emotionally challenging psychologic [sic] for the whole family. And I had my baby born two months prematurely. This was days after this incarceration proceeding. That was a huge threat to me and my family and my coming baby [sic]. And spent a month in the neonatal intensive care unit with my newborn baby. It was a very stressful situation. You know, totally careless, dehumanizing, and traumatic to everybody, my son, the baby. This has nothing to do about  and at the same time how can I trust this person to make decisions for my child? [12/13/23, p. 104-105]
Defendant contends that:
I'm not an alcoholic. I'm not a drug addict. So why should my rights be taken away from me when I'm a good person. I'm an attorney and I make good ethical decisions for my clients and my family. And lastly what I wanted to say is I have my baby and his mother trusts my decisions. I have no disputes with her about decision-making. It's a totally different person. It's a totally different child. So for this plaintiff to come into court claiming I'm a bad decision-maker doesn't make any sense because I have an example of another woman, another child, and there is no complaints about decision-making or complaints . . . [12/13/23, p. 105]
Defendant testified in the narrative on his direct that his "mode of operation" is to be "the one trying to resolve the situation, trying to be amicable to meet in the middle, to work through it, not to get people upset, not to get everyone upset, not to call [sic] any names, not to waste time on court with attorneys . . . " [12/13/23, p. 65-66]. He testified that the divorce and the post-judgment litigation are, in effect, plaintiff's attempt to "manipulate" him:
. . . [plaintiff] was the one who started this whole process [the divorce]. She is the plaintiff and I have been telling this Court for about two years now that it was the plaintiff consistently threatening me with her lawsuit, with her attorney's fees, and with her judgments against me when I'm being the best father that I can be for my child and be a good parent for my child. Now I have a baby who is now one year old. My baby was born October 2022 at the end of the month, [DATE REDACTED], and I was here in court four days before facing incarceration, judgment. [12/13/23, p. 103].
Defendant testified in the narrative on his direct that, in effect, he is the better intellectually equipped of the two parents to make decisions for the child regardless of the terms of the parenting agreement. He testified that ever since 2007, when he met the plaintiff, he has helped her and any of her family members whenever they needed legal advice and that he has been working in courtroom representing many people since 2009 and that for "14 years, I have been an attorney making legal decisions for all of these different people. So I am the one capable of making decisions for my child . . . " and that it is "totally irrational, unreasonable, doesn't make any sense" for plaintiff, who does not have as much formal education as he does, to believe that she should have sole legal custody and final decision-making for the child [12/13/23, p. 59-60]. 
On cross-examination, defendant questioned the plaintiff:
Q. And did you ever have any graduate degree?
A No.
Q Do you have any training in medical training?
A No.
Q Do you have any training in education?
A No.
Q Any legal training?
A No. [8/4/23, p. 148-149]
Defendant testified on his direct that:

 . . . It's with my education that I was able to excel, get  become an 
 attorney and I'm the one making decisions for the child. The plaintiff does 
 not have a grad school education. She's an office assistant. She's got no 
 medical training. She's got a low salary. She changed jobs recently. She 
 manages the office and buys supplies for the office. So I think I'm much 
 more equipped than the plaintiff to make decisions for my child . . . 
 [12/13/23, p. 61].
The defendant places enormous value on his level of education and the weight he believes that educational background should have in who makes decisions for the child and appeared incredulous that the plaintiff would question what he believes are his greater insights into the best interest of the child based on his level of education.
Plaintiff testified on direct examination that each time the parties have had a disagreement on a major decision she has asked the defendant to go to the parenting coordinator with her starting as they agreed to do in the parenting agreement. She testified that she first asked him to go to the parenting coordinator as early as June 2020 — just seven (7) months after the parties' entered into their parenting agreement — but that the defendant refuses to go.
Q. Does your agreement uphold, if you disagree, to go to a parent coordinator?
A It does.
Q Have you ever gone to a parent coordinator to resolve any of these issues?
A No. [8/4/23, p. 120].
Plaintiff testified that defendant refused to go to the parenting coordinator in e-mails to her including one dated June 18, 2020 [Plaintiff's exhibit 20] in which defendant wrote:
I will not pay for any coordinator. This is a total waste of money. You have violated this agreement repeatedly by refusing to share custody of the cat [pet], refusing to reimburse me for the cat [pet], refusing to reimburse me 50-50 for child-related expenses . . . [12/13/23, p. 117].
She testified that as late as 2022 she continued to ask defendant to go to the parenting coordinator pursuant to the parenting agreement regarding the child's continued enrollment in private school [8/4/23, p. 141]. She testified:
A. I have tried numerous times, four at least, and there were also instances when I brought this up verbally to him, about seeing the parenting coordinator. But the defendant never wants to agree to seek that. And I feel like he just wants to make unilateral decisions without the needed tie breaker when the dispute arises.
Q What are you asking the Court to do today?
A I would like to have sole legal custody, so I can make decisions on my child's future in [*8]medical, dental, educational situations, because there may be situations where things need to be resolved quickly. And we cannot afford to go back and forth, and back and forth, and try to find the defendant's better moods to present him where he is not willing to fight. [8/4/23, p. 143-144]. Defendant conceded on cross-examination that the parties' parenting agreement requires them to utilize a parenting coordinator when there is any disagreement on a major decisions [12/13/23, p. 110-119]. Defendant did not dispute plaintiff's allegation that he has always refused to go to the parenting coordinator but tried to excuse his non-compliance by, in effect, a self-serving claim that he "knows best" and that if he withholds his consent that there is no longer any disagreement even when he refuses to use the parenting coordinator [12/13/23, p. 115; Exhibit 23A-C]; however, there is an on-going disagreement between the parents about whether the child should continue attending private school which was one of the primary disagreements raised between the parties in prior application and which resulted in this evidentiary hearing [Faina P. v. Alexander S., 78 Misc 3d 1225(A)].
PRIVATE SCHOOL
The child was enrolled in a private pre-kindergarten during the 2019-2020 school year when the parties entered into their parenting agreement [8/4/23, p. 38]: that private school is specifically named in the parties' parenting agreement. 
Plaintiff testified that the parties considered enrolling the child in a public school gifted and talented program for the 2020-2021 school year; however, there is no dispute that when COVID protocols resulted in public schools operating virtually in 2020 the parties agreed that the child would continue in the private school he attended for pre-k because that private school continued to offer in-person education [8/4/23, p. 39]. The child attended kindergarten at that private school for the 2020-2021 academic year and the defendant paid his one-half (50%) share of the tuition directly to the private school for awhile [8/4/23, p. 40][FN7]
; however, plaintiff testified that when she sought enforcement related to defendant's non-payment of basic child support the defendant unilaterally stopped paying his share of the private school tuition.[FN8]

In prior litigation, defendant took the position that his payment toward private tuition should off-set his payment of basic child support despite the parties' stipulation of settlement which provided for a basic child support award and that the parties agreed to share equally (50/50%) the cost of any private school [NYSCEF #7]. The parties' stipulation of settlement provides, as relevant here, that: "the parties agree that in the event their Child should be enrolled in private school, the parties shall be equally responsible for private school tuition" [NYSCEF [*9]#7]. 
Defendant conceded that he wanted to send the child to private school in 2020 but, he contends, he never agreed with the child remaining in the private school. He testified in the narrative on direct that despite initially agreeing that the child should attend the private school that he can no longer afford the private school given his new financial obligations for a child he has since had with his girlfriend. He contends, in effect, that his consent is required every academic year to continue the child in private school and that after his personal circumstances changed — he started a new family — that he was free to withdraw his consent to the child attending private school.
The only non-financial object defendant asserted to the private school was that he believes the academics are too strict and rigorous and that " . . . every year it is getting more and more difficult" [12/13/23, p. 64].[FN9]
He contends that because he attended public school that the plaintiff should agree to his proposed change that they remove the child from private school where he has been ever since pre-kindergarten and move him to a public school.[FN10]

The plaintiff testified that she wants the child to remain in his current school where, she testified, the child is "on the principal's honor roll" and received certificates of recognition [8/4/23, p. 80]. In addition to asserting that she believes the child is thriving academically at the private school she testified that the extended day schedule of the private school also provides child-care coverage for her to work full-time on days when she has parenting time but allows the defendant pick-up the child early on days he has parenting time with the child if his work schedule allows.
Plaintiff testified that when she did not defer to defendant's desire to remove the child from his current school and move him to public school that defendant again refused to use the parenting coordinator as provided in the parenting agreement but tried to obtain his desired outcome through financial coercion by no longer paying his one-half (50%) share of the tuition and actively working to undermine her with the child's school administration and teachers in an effort to force her to accept the change to the child's school that he wanted [8/4/23, pp. 66-68]. 
Plaintiff testified on direct examination that defendant unilaterally stopped paying towards the tuition:
Q Did he ever discuss it with you?
A No.
Q Did he ever ask you to go to a parent coordinator?
A He did not. [8/4/23, p. 60].
In an e-mail dated January 12, 2023 at 8:54 AM [plaintiff's exhibit 4 in evidence], defendant stated that:
"Until the pending litigation and all motions are resolved, I object to my son's enrollment in [private school] for third grade. The price has now gone up to $1,400 per month (from $1,300) and will keep going up each year."
Plaintiff responded by e-mail dated January 12, 2023 at 10:37 AM [plaintiff's exhibit 4 in evidence]:
"I object [sic] [the child] leaving [private school]. This is a very good school, which is advance [sic], in accordance with [the child's] abilities. This school has a school bus and after-school till [sic] 6pm . . . "
To which defendant by e-mail dated January 12, 2023 at 5:12 PM [plaintiff's exhibit 4 in evidence], responded:
"[The child] will go to public school if nothing is resolved . . . "
On cross-examination by defendant, the plaintiff testified that:
Q. Do you recall the defendant telling you that he had a lot of other expenses for the child prohibiting him from paying for the school, such as clothes, food, utilities?
A You know, the defendant e-mails me his list of expenses. And no offense, that's just what everybody has. Everybody has to somehow pay mortgage or rent. It is just a given [8/10/23, p. 312].[FN11]
On cross-examination by the attorney for the child, the defendant testified that the issue of the child remaining in the private school was "resolved" because when he stopped paying tuition the plaintiff paid the full (100%) cost of tuition and that he did not object to the private school as long as the plaintiff paid for it. On continued cross-examination by the attorney for the child, the defendant testified:
Q And so I'm just trying to be clear here. In your view you resolved the issue of what school he will attend year after year after year by allowing him to stay as long as [plaintiff] pays the full cost?
A Is your question about the fee or is your question about the school? I'm confused. What I said was that yes, I initially objected to the school but I'm agreeing to the school. The money is a totally separate question and I'm objecting to it. [12/13/23, p. 148-149].
Defendant does not object to the child continuing in the private school if plaintiff is solely (100%) financially responsible for the cost so his withholding of agreement is based not on the best interests of the child but on financial considerations and amount to a clear attempt to [*10]try to circumvent both the parenting coordinator provision of the parenting agreement and the parties' agreement to share equally (50/50%) the cost of private school in their stipulation of settlement.
On cross-examination by defendant, plaintiff testified:
Q. Didn't the defendant say he could stay in the school as long as the defendant does not pay for the school because he can't afford it? The child can stay in the school.
A I don't see that as a resolution. Because our custody agreement states 50/50 on private school. So there were issues with the school, and I presented a list of the reasons why the school was in my opinion superior. I asked to go to a parent coordinator to resolve this issue [8/10/23, p. 314].
She testified that, in addition to refusing to following the protocol to use a parenting coordinator in the parenting agreement and using financial coercion to force her to agree to what he wanted, the defendant tried to undermine the child's enrollment in the school directly by repeatedly e-mailing the child's school that the child will be leaving to attend public school despite knowing that she opposed changing the child's school. 
The plaintiff testified that she believes that defendant's unilateral communications with the school that the child will be leaving jeopardizes the child's enrollment status and continuity of education and causes a lack of stability for the child and is, she believes, part of an ongoing effort by defendant to get his way without complying with the judgment of divorce. She testified on direct examination:
Q. Does his actions by sending [these] emails in any way jeopardize your joint decision-making?
A. Yes. He has sent this type of e-mail, maybe even the same words, on numerous occasions, to the school. And it kind of makes, I believe, in my opinion, based on these e-mails, makes the school not trust me. And not think of me in a fair way." [8/4/23, p. 76].
Plaintiff contends that defendant's efforts to involve the school are both to try to intimidate her and to get his way on the issue of school without considering her opinion, complying with the parties' agreement, or considering the child's best interest in educational stability. On cross-examination by the defendant, the plaintiff testified that the defendant's involvement of school administration and other parents in the school in the parties' dispute causes her great concern:
. . . I was extremely afraid that the school may kick us out. Because they don't want to deal with all of this baggage. They are a school. They need to teach children. They don't need to be involved in our marital disputes honestly [8/4/23, p. 176]. 

Plaintiff continued to testify on direct examination:
I have brought up on numerous occasions discussion of enrollment in second grade, enrollment in third grade. And it is very difficult because the defendant continuously brings up the fact that we are in Court. And he constantly dismisses all my reasoning to stay in the current school. I list them constantly to him. They are very sound reasons. There is additional, lots of benefits to the school. And in response I, he often, based on his e-mails, I read that he wants to just [sic] not talk about it. And wants to just discuss [*11]the Court. And unless this litigation are over, he does not want to give me any kind of consent. He withholds his consent continuously. [8/4/23, p. 60-61].
She testified that this pattern of financial coercion has been defendant's methodology for seeking to get his way ever since the parties divorced. She testified that if she does not allow defendant to make every decision for the child that he stops communicating with her (a form of "stonewalling" her) and/or stops paying until he gets his way or she is forced to pay the full (100%) cost for the child to continue. She testified that to ensure that the child's educational stability was not jeopardized she was forced to pay the defendant's outstanding share of tuition while her enforcement action was pending [8/4/23, p. 69] all while she was not receiving basic child support from defendant and incurring counsel fees trying to enforce the parties' judgment of divorce. She testified that it is impossible to make joint decisions with the defendant because it is, in effect, "his way or the highway" and that the parties are always at an impasse because he will not follow the protocol in the parenting agreement.
Plaintiff testified that she believes that this is a continuing methodology by the defendant where he agrees to something for the child only to change his mind after the child is involved and will only allow the child to continue if she pays for it entirely. She contends, in effect, that defendant is purposefully engaging in a scheme to avoid his financial obligations under the terms of the parties' stipulation of settlement and that while custody and finances are separate, she believes that the defendant refuses to comply with the parenting agreement because he bases his decisions solely on finances and without also considering the best interest of the child. She testified that the impact of defendant's behavior is to create disruption and inconsistency for the child and that it creates a significant power imbalance between the parents which makes joint decision making impossible. 
Q: Have you asked him for the money?
A: I have asked him. But at some point I just feel like it is useless. And I am afraid that he will retaliate against me. And try to bring up any more motions against me that break up relationships between me and the school, or me and friends, or me and my vendors, or any medical providers, like attorneys. And I am constantly in fear that he will bring up new motions that are irrelevant, at least in my opinion, towards co-parenting, and just try to hurt me. And just put me down as a person." [8/4/23, p.85].
On cross-examination, defendant conceded that he refused to use the parenting coordinator any of the numerous times that plaintiff asked him to but, he contends that the parties never needed the parenting coordinator because, according to him, the parties eventually reached "agreements" each time. According to the defendant, the parties successfully resolved each disagreement because eventually both parties got what they wanted: plaintiff got his agreement to let the child continue in whatever activity (private school, summer camp, extracurricular activity, etc.) if he got out of his financial obligation under the parties' stipulation of settlement providing that the parties will share (50/50%) for any of those expenses:
Q And you obviously had a disagreement with [plaintiff] about summer camp, correct? You don't believe your child should be in summer camp, correct?
A We resolved that issue as I testified before.
Q Yeah, as long as you got what you want it's resolved.
A She got what she wanted. We both got what we wanted. [12/13/23, p. 142].
[*12]Brain Trauma Accident
It is undisputed that in October 2020 the child suffered a traumatic brain injury when he was hit by an automobile which required hospitalization before ongoing medical care and numerous therapies. The record established that the parties were not in agreement about whether the child should re-enter school in kindergarten (the grade he had recently started) or if he should repeat pre-k to ease him back into school. While contending that he believed that the private school was too rigorous for the child and disparaging the teachers, defendant alternatively criticized the plaintiff at trial because, in his opinion, she did not exercise good judgment when she was hesitant to send the child back into school immediately after his brain trauma incident. He contends that after the accident in October 2020:
. . . the mother, the plaintiff, she unilaterally decided to take him out of the school when he was cleared to go back to school because he was released to full duty to go back to kindergarten. She started writing me emails, text messages insisting that he was not able to go back to kindergarten and she wanted to bring him back a grade to pre-k which was a different school. I went back and forth with her for weeks talking to her, talking to other people and trying to reason with her that he was cleared to go back to school and he should go back to school [12/13/23, p. 98].
Plaintiff conceded on cross-examination by the defendant that she was uncertain whether returning the child to kindergarten was best or whether, to allow his brain to recover without added strain, the child should repeat pre-kindergarten [8/10/23, p. 256-257] but that contrary to defendant's allegation she did not remove the child from school. She testified that she only asked to be removed from a group text message where parents from the school were discussing day-to-day school related topics:
. . . because they were discussing homework, and explaining about how difficult it was to social studies, or math homework, and my son laying lifeless [sic] a hospital bed, unable to speak, communicate, make eye contact. I was far, I did not want to hear parents complaining about the day-to-day stuff. Day-to-day about what homework it is. And so, yes, I kept on getting message, and I didn't want to read them. Because at that point I wasn't sure if my son will ever speak again. He had a feeding tube. How could he be part of this? Yes, it hurt me. I was crying every day, I was crying every day because my son had a severe brain injury. And he wasn't speaking. And the doctors were not giving me any answer of, if he will ever recover . . . [8/10/23, pp. 269-270]. 

Plaintiff testified that since the parties could not agree on the best way to reintegrate the child into the school that she asked him to comply with the parenting agreement and go to the parenting coordinator to try to resolve the issue but that, by e-mail dated October 26, 2020, he refused to go to the parenting coordinator saying it was a waste of money and that the teachers would assess the child [8/10/23, pp. 275-276; Defendant's Exhibit D in evidence]. 
E-MAIL from plaintiff to defendant dated October 26, 2020, at 4:48 PM:
"Hi [defendant]
Since we disagree about the Pre-K vs Kindergarten, we need to see the parenting coordinator to resolve the conflict."
E-MAIL defendant responding to plaintiff dated October 26, 2020, at 7:18 PM:
"The teachers at his school will assess him. There is no need to pay $250 per hour for some parenting coordinator who has no clue about our child and never met him."
Defendant did not dispute that he refused to go to the parenting coordinator related to the school issue asserting that the parenting coordinator would have been expensive and would not have been able to help the parents resolve the issue. 
Plaintiff testified on cross-examination by the defendant that the issue was not whether the child should have repeated pre-K or was ready to continue with kindergarten but that what was relevant was that in the midst of the crisis  when the outcome was uncertain — the parents were unable to agree on the best course of action for the child's return to school and that even then during a medical crisis the defendant refused to abide by the parenting agreement to see a parenting coordinator:
. . . I wanted to give my son time to recover from his brain injury. And I didn't go against the defendant. I wanted to see the parenting coordinator. That is nothing wrong with that, where we disagree [8/10/23, p. 285].
Child's Homeroom Teacher: Ms. K
Defendant called the child's homeroom teacher [Ms. K] who testified virtually. She testified that "[b]oth parents are great for me like school teacher [sic]" and that she maintains daily contact with both parents [12/13/23, p.]
Ms. K testified that in October 2020, after the child sustained a brain trauma when hit by an automobile the mother was "very worried about his health and can not decide to go take him out of school or not" [3/28/24, p. 13]. She testified that she recommended that the child remain in the school because "the boy is very smart" [3/28/24, p. 13]. Defendant then testified that he wanted the child to remain in the private school and that the plaintiff agreed to leave the child in the private school.
Ms. K testified on two (2) dates.[FN12]
Plaintiff did not cross-examine Ms. K on December 13, 2023, but plaintiff did cross-examine her on March 28, 2024 during which she testified that the child is doing well in school, achieving good grades, adjusting well socially in school and is a pleasure to teach [3/28/24, p. 15].
Intimidation
On cross-examination by the defendant the plaintiff testified that while she is not comfortable riding in the defendant's car because "[defendant] has some emotional issues towards me" [8/10/23, p. 304] but testified that despite her personal discomfort she continues to support the child's desire to spend additional time with the defendant. She testified to an incident in July 2023 when the child had surgery in Manhattan and the defendant asked the child directly instead of the plaintiff if he wanted to ride home in the defendant's car even though it was plaintiff's parenting time [8/10/23, p. 304]. 
Q. But you last drove with the defendant and the child in July 2023; isn't that true?
A Because the child had surgery that day. And the defendant asked the child to drive with him. Not the parent. Because the parent didn't agree with that. So I was, had no choice to [*13]oblige when you asked your child if you want to drive with your father. And not take public transportation. It puts me in a very difficult situation [8/10/23, p. 303].
Plaintiff continued that despite defendant putting her in an uncomfortable position she acquiesced and did not object to defendant driving the child home:
Q. . . . Didn't the defendant drive the child in the morning to the hospital?
A That was his parenting time. I cannot control what you do during your parenting time. Q So you couldn't allow the defendant to drive the child back home after the procedure?
A During my parenting time, I have a right who the child goes in the car with. So I didn't feel comfortable with myself and the defendant in the same car.
Q Okay. Wasn't it in the best interests of the child for the parents to drive the child from Manhattan to Brooklyn?
A I was going to take a cab home. So I preferred not being in the same car.
Q You had a choice whether to drive with the defendant or not. And you made a choice to go, correct?
A No. The question was asked to the child, not to me. So when the child answers that he wants to spend more time with his father, I cannot say no. [8/10/23, p. 304].
CHILD'S DENTAL CARE
Defendant testified that in 2021, a few months after the child had a head trauma as a result of being hit by a car, the child's pediatric dentist recommended that the child get a dental crown but after a few attempts to do the procedure without sedation the plaintiff wanted to use anesthesia but he did not agree but that the parties eventually resolved the issue with the child getting the crown without the need for anesthesia from a pediatric dentist defendant found.
Plaintiff testified that the parties have been unable to make joint decisions together related to the child's medical or dental care. The parties' parenting agreement specifies that the child's pediatric dentist is Dr. K. She testified that the parties tried over three (3) dental visits to get the child's teeth filled and a crown placed but that after all those attempts, including one using laughing gas which plaintiff testified was not covered by her insurance at the time, that she witnessed defendant "in a very heated argument with the doctor. And to the point he was screaming at her. At that session the defendant was asked to step outside, and escorted outside of the office" [8/4/23, p. 99]. She testified that this took place in front of the child [8/4/23, p. 101]. On cross-examination by the defendant the plaintiff testified that her understanding is that Dr. K will no longer treat the parties' child if defendant is present because of his behavior in the dental office:
Q. And this was the only time that you say that the defendant was unstable with Dr. K, correct?
A After this date when I tried to bring the child in for a general cleaning, the doctor said that the defendant cannot be present in the office because Dr. K was scared of the defendant. And so if I wanted to bring the child, it had to be without the defendant. At that point I understood that I would not be able to ever see this doctor, because I could not, the defendant wouldn't agree not to be present at the dental appointment [8/10/23, p. 332].
On cross-examination by the attorney for the child, plaintiff testified that she understood the incident between defendant and Dr. K related to the cost of the laughing gas:
Q. Ma'am, with respect to [the child]'s, the dental procedure that, the filling, and root canal, and the cap, did [defendant] in the doctor's office express a specific objection to the procedure?
A He was upset that the doctor didn't do his job. And that she was charging for it. Because she was charging for the laughing gas, which was always a private procedure [8/10/23, p 397].
Plaintiff testified that defendant, without her consent, refused to utilize Dr. K as the expert for dental decisions even though the parties had specifically selected her for that role in their parenting agreement [8/4/23, p. 102] and insisted that he wanted to use a different pediatric dentist. Plaintiff testified that based on defendant's objection to Dr. K she relented and took the child to the pediatric dentist defendant suggested in an e-mail to her, Dr. M [8/4/23, p. 104; Plaintiff's exhibit 13 in evidence]. She testified that Dr. M was a pediatric dentist Dr. K recommended to the parties but when she took the child for a consultation with Dr. M the defendant threatened Dr. M "with disciplinary, the involvement of the Dental Disciplinary Committee, and the New York State Department of Education" if she performed any dental work on the child [8/4/23, pp. 108-109; plaintiff's exhibit 14 in evidence].
By e-mail dated September 8, 2021, at 10:32 AM the defendant to Dr. M:
" . . . I hereby advise you that you or anyone else at your office have no permission to perform any medical treatment for my son."
Subsequently, when the plaintiff by e-mail dated September 9, 2021 at 11:16 AM wrote the defendant: "I would like to seek the advice and mediation of an expert, in reference to filling the two large cavities for [the child]" and referencing the parties' parenting agreement which provides for the parties to speak specifically with Dr. K on dental disagreements the defendant responded — just two days after e-mailing Dr. M that he was not to treat the child  "I do not trust Dr. K" and "I agree to chat with Dr. M, the 'successor' for now" [plaintiff's exhibit 13, in evidence].
She testified that due to defendant's interference she had to take the child to see four (4) different dentists to get the fillings done and the crown placed and that resulted in a delay of more than seven (7) months [8/4/23, p. 105-106]. She testified that she did not believe that so much delay and so many dental visits was in the child's best interest [8/4/23, p. 108]. 
Child's Pediatrician: Dr. S
Defendant called the child's pedestrian [Dr. S] who testified virtually. He testified that he has seen the child in his medical professional capacity approximately four (4) times annually since the child was born. He described his interactions with both parents as "[t]hey were very, very good. I think both parents are very nice people. Both attended each session that I saw the child. Both had very good questions. Both were very polite and very respectful to me and showed that they were good parents in my judgment" [12/13/23, p. 37-38]. 
Dr. S testified that the child, after some time at a rehabilitation center, was able to return to school after he was involved in an automobile accident in 2021 and did not appear to sustain any prolonged limitations or disabilities other than "maybe there was a little bit of memory that he had to reestablish" [12/13/23, p. 49]. 
He testified that in his experience both parents were involved in the appointments when he treated the child except that only the mother was present when he administered the COVID vaccine to the child [12/13/23, p. 46]. 
COVID Vaccination: December 2021
Defendant testified that, in effect, he should not be penalized for acting unilaterally because, in effect, the plaintiff acted unilaterally by getting the child a COVID vaccination for the child two (2) week earlier than they had agreed to. He conceded that by text message in November 2021 he agreed that the child should get the COVID vaccination in the New Year. Defendant contends that during December 2021 he learned that the child had received the first COVID vaccine shot without his advance knowledge of the appointment [12/13/23, p. 75]. 
Defendant testified that "I didn't oppose the vaccine. I was not disagreeing. All I wanted was to wait because it was a new vaccine" until the New Year [12/13/23, p. 78]. 
Plaintiff testified that in or about December 2021 circumstances changed because:
. . . there was a New York City mandate issued by the Mayor stating that children five and over need Covid vaccinations to, for any group functions like entertainment venues, like circuses, or any extracurricular activities like swimming and Tae Kwon Do. And, or to go to restaurants that, and attend restaurants that [the child] and I and I am fairly sure the defendant also attends restaurants and entertainment venues with" [8/4/23, p. 112]. 

Plaintiff contends that based on the change in New York City policy and based on the consent of the defendant to the vaccination generally she scheduled the COVID vaccine two (2) weeks earlier than planned: "[a]ll I did was move it [the COVID vaccination] down by two weeks because of the mandate" [8/4/23, p. 113]. She testified that in response, defendant filed a contempt motion against her for getting the child vaccinated two (2) weeks early and initially withheld his consent for the child to receive the second vaccination shot in the series [8/4/23, p. 117]. 
On cross-examination by the attorney for the child, plaintiff testified that defendant never objected to the child receiving the COVID vaccination:
Q. And with respect to the second Covid vaccine, did [defendant] express to you what his issue, whether he had an issue with the vaccine itself?
A No. He agreed to the vaccine in November. And he just told me that the school was not mandating it. And I felt that it was an irrelevant point. Because I felt it was necessary for other reasons.
Q At any time did he tell you he thought the vaccine was dangerous?
A No [8/10/23, p. 379-380].
Health Insurance
Plaintiff prioritization of finances over the best interest of the child was exceptionally obvious when he refused to cooperate in obtaining health insurance for the child including refusing to add the child to his health insurance through his employer when she lost her job and health insurance despite asking him to investigate adding the child to his health insurance [8/4/23, p. 86-87]. 
The parties' stipulation of settlement dated November 12, 2019 provides that:
. . . The parties agree to consult with each other every three years or upon a job change [*14]to determine who has available to them more cost efficient medical insurance for the Child [emphasis added]. Any out of pocket expenses to cover the Child's medical expenses shall be paid 50% by the Wife and 50% by the Husband. To the extent that the Mother or Father is able to obtain dental insurance coverage for the Child, the parties shall contribute to the cost of such coverage on a 50-50 basis [NYSCEF #7, pp. 24-25].
Despite the clear terms of the parties' stipulation of settlement, the plaintiff testified that the defendant "dismissed" her request to explore health insurance coverage for the child with his health insurance after she lost her employment and that, as a result, the child was not covered by insurance for a time and was then covered by Fidelis because the defendant would not add the child to his health insurance [8/4/23, p. 87-89]. The court rejects the defendant's position at trial that his willingness to discuss health insurance options for the child had "nothing to do with custody, and decision-making" [8/4/23, p. 90]. 
Plaintiff correctly took the position that selection of medical insurance is a major decision [8/4/23, p. 92]. Plaintiff's exhibit 11 in evidence is an e-mail from plaintiff to defendant about losing her job and seeking defendant's assistance in obtaining health insurance:
Q Can you read what you wrote to [defendant] regarding your loss of job, and his response?
A "Hi, [defendant]. I have been laid off today from my job, effective date 8-29-2022. "I have medical and dental insurance until September 10th. [The child] needs to see a pediatrician for his annual school form for back to school. I will schedule it ASAP, after you come back. "Please investigate at your job on how you can add [the child] to your insurance, and let me know what are the options. "Thank you. "[Plaintiff]."
Q Can you read for the Court what his response was?
A Yes. "Perhaps it is finally time to stop wasting money on attorneys, and move on with your life. "I will also lose my job if I get arrested. "I do not have extra money to pay other than the 1,500 per month. "You should apply for Medicaid now for yourself and the child. "Pediatrician appointment for 9-6 is fine." [e-mail is Plaintiff's exhibit 11 in evidence]
Q How did that make you feel when you received that?
A Extremely sad for my son. And the well-being of him, especially since he has a brain injury, and he needs to be seen by a doctor. At least. And have protection just in case something happens. [8/4/23, pp. 90-91]
Plaintiff testified that the defendant "will not support my decisions, or does not want to participate financially, or even add [the child] to his insurance" [8/4/23, p. 95]. She testified that "I discuss it with the defendant. It try. But there is really no discussion" [8/4/23, p. 95].
On cross-examination by defendant the plaintiff testified that she had never agreed to the defendant's suggestion that she enroll the child in Medicaid as he suggest but that he had, in effect, left her no choice but to do so because he refused to communicate with her on the issue [8/4/23, p. 156-157]. Defendant questioned plaintiff on cross-examination:
Q. Ultimately, the issue with the insurance was resolved, correct?
A I don't think so, that it was fully resolved. It is, there is a bandaid on the issue. Yes, my insurance, I have insurance for my child at this particular moment. Is it the best insurance? I don't think so. There could be better options through the defendant. [8/4/23, [*15]p. 163]. 
SUMMER CAMP
The parties' parenting agreement provides, as relevant here:
With respect to the choice of, and application to, summer camp, organized summer activities, and extra-curricular activities the parties shall similarly consult with each other and shall take into consideration the wishes of a Child. The Parties must agree on the choice of day camp/sleep away summer camp as well as the length of attendance/stay [pp. 7-8].
Defendant testified that the parties disagree over whether the child should attend summer camp. Defendant testified that he works full-time at a law firm, but that his schedule is flexible so he can spend time with the child during the summer so there is no need for summer camp [12/13/23, p. 143]. He testified that he does not agree with the plaintiff's use of summer camp for child-care during the summer and that she should be spending her parenting time with the child during the summer like he does [12/13/23, p. 90]. Plaintiff contends that she has no option but to enroll the child in summer camp to allow her to work and that defendant should not criticize her for working full-time or needing childcare. She also contends that she does not believe that it is in the child's best interest to sit "in the house watching [defendant] working" on his parenting days [8/10/23, p. 239] and that it would be better for the child to attend summer camp consistently during the summer instead of only on days when she has parenting time so that the child could enjoy all of the activities of camp including socialization but that she does not tell the defendant what to do with the child during his parenting time. 
On cross-examination defendant initially testified that he had no obligation to financially contribute toward camp expenses; however, when confronted with the parties' stipulation of settlement he conceded that he was obligated to pay for one-half (50%) of summer camp expenses [12/13/23, p. 137-138]. He testified that instead of using the parenting coordinator to resolve disagreements about summer camp that "if we have [sic] disagreement about certain activities, she sends [the child] to the activities on her days and then [the child] doesn't go on [my] days" [12/13/23, p. 91]. Plaintiff testified that defendant has refused to contribute financially to summer camp so that she can work. Defendant does not dispute that because he has never paid for any portion of summer camp.
Plaintiff testified on cross-examination that defendant's refusal to engage in the decision-making protocol in the parenting agreement to resolve the disagreement over summer camp was not in the best interest of the child because it deprived the child of stability [8/10/23, p. 239]. She testified on cross-examination by the defendant that while there is no requirement that the child attend camp during the summer and that "what you do during your parental time is what you do. I don't interfere. But I do believe that the child needs stability throughout the year and in the summer" and that she believes that the only way the child can have stability is if the parents utilize the decision making protocol they agreed to in the parenting agreement [8/10/23, p. 239]. 
Defendant appears to classify any extracurriculars plaintiff selects as "overburdening" [12/13/23, p. 93] the child while assuming any selections he chooses are the de facto better options for the child without taking the plaintiff's opinion into account which leads to him making unilateral changes to the child's existing activities without including the plaintiff in the [*16]decision. 
RUSSIAN LANGUAGE INSTRUCTION
As relevant hereto, the parties' parenting agreement requires that the parents "consult" with one another related to tutoring [JN, p. 7]. On cross-examination by the defendant the plaintiff testified that the child was in ongoing weekly Russian language instruction at the time the parties divorced but that the defendant unilaterally ended that instruction, without consulting with her, when the child started school:
Q Okay. And then, did you and the defendant have a disagreement with the Russian classes?
A Initially, I thought we were on the same page. That we encouraged it. As far as I understood. And defendant also asked to have the classes in his house, and supported that, and paid for them. And at some point the defendant wanted to stop.
Q Did the defendant tell you since the child has Russian class in school, that was sufficient?
A No, he notified, you notified the provider of the tutoring sessions directly without my consent. [8/10/23, p. 294].
Defendant continued to question plaintiff about the Russian instruction:
Q. But the issue with the Russian class was ultimately resolved, and he continued the Russian classes, didn't he?
A No. It wasn't resolved. Because I have it only during my parenting time, and I fully pay it. So the defendant, it is not resolved. Because I am 100 percent responsible for something that should be at 50/50 [8/10/23, pp. 294-295].
Plaintiff contends that the defendant's unilateral choice to end the Russian tutoring without consulting with her and without her consent when the child had been in ongoing lessons is another example of how he refuses to include her in decisions about the child. Defendant contends that if he changes his mind about an activity he can stop the child's involvement and if the plaintiff wants to continue it on her own she can do so on her time and at her expense. He contends that this includes the child's participation in religious instruction.
RELIGIOUS INSTRUCTION
The parties' parenting agreement provides, as relevant here, that:
"[w]ith regard to the religious upbringing of the Child, the parties agree that the Children will be raised in the Jewish Faith". Testimony at trial established that the plaintiff has actively sought out Jewish religious instruction and activities for the child. She testified that the child is currently enrolled in a once weekly class for a few hours on Sundays that includes sports, arts and crafts and an opportunity for the child to socialize with friends while learning about Jewish religion. She testified that she paid for the cost and that defendant can take the child during his weekend parenting time if he wants to but contends that the defendant does not. At trial, defendant criticized the plaintiff for enrolling the child in this Sunday activity and testified that the child should not be involved in enrichment activities on the weekend. 
Defendant also testified that he objects to the plaintiff allowing the child to participate in [*17]an extracurricular Jewish studies program during the week because it takes the child away from school for an hour every other Wednesday [12/13/23, p. 91-93], which he contends is an academically rigorous day for the child and "it's not a good idea for him to go on that day and then why does he even need to go" [12/13/23, p. 92]. 
Defendant's Criticism of Plaintiff
It is clear from the testimony and from defendant's actions that he has little regard for plaintiff or for cultivating the relationship between the child and the plaintiff. He criticizes plaintiff for needing child-care while she is working even when he has conceded that he stopped paying even basic child support to her for more than a year. He offered no testimony reconciling this disparity. He testified that he believes the plaintiff is, in effect, outsourcing her parenting:
I think for [plaintiff] she's working at the office so she doesn't have enough time to spend with the child. She doesn't have enough time to sit with him and take him to these activities so for her it's convenient to send the child out to the different places for other people to do the work for her. For me I'm the one, I want to do the work. I want to educate my son myself. I want to be the one that spends time with him and I want to be the one who takes him places. And I'm always the one sitting down and doing things with him. I don't need for him to go to all these different activities for other people to teach him and tell him what to do and to educate him. I can do it myself. I don't need assistance from all these other activities. And also the costs. You have to pay for the activities too. So at the end of day you have to pick and choose what you want to pay for and what you can pay for. I can't pay for these activities . . . [12/13/23, pp. 93-94].
Defendant testified, in effect, that plaintiff's testimony that she feels intimidated by the defendant is not truthful because she "comes to my house to drop off [the child's] books, textbooks, clothing, school supplies" and he repeatedly testified that the interactions between them is "amicable". The plaintiff testified on cross-examination by the defendant that she is on "eggshells" around him and that she is fearful walking around the neighborhood where they both live because he has engaged in actions against her, including suing her for allegedly giving him herpes, that make her nervous to be around him.
Defendant's Witness: Mr. K
Mr. K testified that he has known the defendant since they attended high school together and that he and the defendant speak for two (2) to four (4) hours every week. He testified that he believes "that the father is as good of a father to the child as I have experienced in my life" [3/28/24, p. 55]. On cross-examination by plaintiff's counsel he conceded that defendant had not told him that he sued plaintiff for allegedly giving him herpes, that he had sued plaintiff's attorneys for malpractice or that he filed grievances against her attorney [3/28/24, p. 66-68].
PLENARY ACTION
On cross-examination, defendant conceded that he sued the plaintiff in a tort action alleging that she gave him herpes and seeking damages of $1,000,000 [plaintiff's exhibit 19 in evidence]. In that tort action, which he filed himself, defendant identified himself by the pseudonym "John Doe" but used plaintiff's legal name in the caption [12/13/23, p. 120; plaintiff's exhibit 19 in evidence]. In that complaint, defendant — who was plaintiff therein — alleged inter alia that he contracted herpes from plaintiff — defendant therein — during the marriage because, he alleges, she had an affair. It is undisputed that plaintiff provided medical [*18]proof to defendant through counsel that his allegation was not supported by any medical proof inasmuch as she tested negative for herpes so he contracted herpes, if in fact he tested positive, from another point of contact.
Plaintiff contends that defendant had her served by his girlfriend with that tort action at the child's soccer game where the child was present [8/4/23, p. 128]. The parties' parenting agreement provides that:
"Neither Parent shall directly or indirectly make any derogatory statements about the other or their family in the presence of the Child, the Child's schoolmates, campmates, activity-mates or their parents, or any teacher or other personnel of a school, camp, after-school or enrichment program attended by the Child" [p. 3].
Defendant took the position at trial that filing the tort action against plaintiff alleging that she gave him herpes and using her legal name but obscuring his own with a pseudonym and having her served at the child's soccer game were "not relevant" to whether the parties could make major decisions [8/4/23, p. 126]. Plaintiff testified that her name was prominently displayed on the tort case but that she was being sued by "John Doe" and it made her feel that the defendant was harassing her for seeking enforcement of child support in:
. . . every single possible way that he can" and that he "uses his law degree to write pretty, legal cases that I cannot write that easily. I have to hire attorneys like [counsel] and spend money by having to fight something that is 100 percent lies. And it is meant to just tarnish my name. And I have to spend money to fight something that is 100 percent of a lie" [8/4/23, p. 130.]
On redirect of himself, defendant testified that plaintiff was, in effect, making a big deal out of nothing because he withdrew the tort action against her before a judge was involved in the case and that him using her name and serving her at the child's soccer event was not relevant to the issue of joint custody:
" . . . as soon as I received medical documentation that she did not have herpes, I discontinued the case and it didn't even go to court. There were no hearings. It was a very brief stint and this complaint has nothing to do about decision-making for the child, nothing about the child" [12/13/23, p. 150].
Clearly lacking insight into his own actions and the impact of those actions, defendant contends that if anyone was embarrassed by his action in filing the application it is himself because now people know he represented that he tested positive for herpes.
Defendant's Lawsuits Against Plaintiff's Attorneys
Plaintiff testified that defendant has repeatedly interfered with her attorney-client relationship to intimidate her to allow him to get his way. It is undisputed that defendant has filed malpractice lawsuits and grievances against plaintiff's former and present attorneys throughout this litigation. Plaintiff testified that defendant filed lawsuits against her prior attorneys "[a]nd because of that, they fired me as a client" and "refused to represent me. And her firm disallowed her to represent me" and that it "caught me by surprise. And quite honestly, stuck me in an emergency, because at the same time the defendant brought an action against me in Family Court" [8/4/23, p. 86].
Defendant conceded that he has sued each lawyer who has represented plaintiff including filing a malpractice action attorney and a grievance against her current attorney of record [12/13/23, pp. 126-127]. Defendant conceded on cross-examination while being questioned by plaintiff's attorney:
Q Did you sue [M. R.]?[FN13]
A Yes.
Q Did you sue [D H & C LLP]?[FN14]
A Yes.
Q Did you sue [G. H.] individually?[FN15]
A Yes.
Q You sued [B. P.] individually, correct?[FN16]
A Yes.
Q And you sued my firm [B. D. P & Associates, P.C.], correct?[FN17]
A Yes.
Q And you did this, you actually filed  you did this in the middle of this litigation, correct?
A Yes.
Q And as you sit here today you can make  you sued every lawyer that ever represented her in cases between you and her, correct?
A Like I said, I don't know which lawyer she had. I answered your questions about who I sued and who I didn't sue.
Q You think you can make joint decisions when you sue every lawyer that represents her, yes or no?
A Making decisions  the herpes lawsuit has nothing to do with making decisions for the child.
[DEFENDANT]: This is an objection about relevance.
A My private lawsuit has nothing to do with my decisions for my child. This is apples and oranges, nothing to do with this and that.
THE COURT: Objection overruled. [12/13/23, pp. 129-130]
Defendant took the position that his choice to sue each of plaintiff's attorneys and to file grievances against them had no relevance to whether he and plaintiff could make joint decisions for the child. He repeatedly testified, in effect, that if the plaintiff would simply accept, in his opinion, his greater level of insight and added based on what he perceives as his higher intellect based on his level of education compared to her being an "office worker", then there would be [*19]no need for judicial intervention. He testified that involving the court and having an attorney for the child was not in the child's best interest [12/13/23, p. 89]. 
Plaintiff testified that defendant's choice to sue any attorney who represents her makes her "constantly afraid that if I say anything to him, that he will bring another legal case against somebody else, and I don't even know what I say that he can file new motions or find new cases somewhere" which makes it impossible to make joint decisions with him because if she opposes him on any decision she risks being frivolously sued or having her attorney sued as part of defendant's weaponization of his license to practice law to force her to submit to his preferences [8/4/23, p. 132].
Intimidation
Defendant testified that outside of major decision making for the child the parties have "amicable communication" and an "amicable relationship" where "[e]verything is peaceful" [12/13/23,p. 83].
Plaintiff testified credibly that defendant has "followed me" and "taken pictures of me" in the neighborhood where the parties live [8/4/23, p. 125]. She testified that it "makes me feel so uncomfortable just walking near my house" [8/4/23, p. 127] and that "[i]t is very difficult to come to an understanding and to speak comfortably with a person that is trying to harass me, and to follow me, and thinks extremely negatively on me" [8/4/23, p. 127].
Defendant cross-examined plaintiff about her testimony that she is intimidated by him:
Q. Now, you mentioned before that you were threatened by the defendant. But isn't it true that you came to his house multiple times?
A To drop things off.
Q And you weren't worried when you were coming to, from your house  Withdrawn. How far, how far is your house from the defendant's house?
A Three blocks.
Q And how far, how long is that walk?
A Ten, 15 minutes.
Q So you had to walk from your house to the defendant's house to drop off some clothes?
MR. PERSKIN: Objection to relevance. Dropping off some clothes or something in a custody.
THE COURT: Overruled. But subject to connection.
THE DEFENDANT: Yes.
Q The point is the that you went, you took the time to walk from your house to the defendant's house to drop off some things at his apartment, correct?
A For the benefit of the child. If he needs Tae Kwon Do clothes. If he needs soccer clothes. If he needs swimming clothes. And the defendant refuses to buy the Tae Kwon Do clothes or soccer clothes, I wanted to make sure that my child had the appropriate things. I am always uncomfortable near your house. 100 percent of the time. And I am scared, honestly.
Q Why do you come to my house if you are so uncomfortable?
A Because I want my son not to know about this [8/10/23, pp. 361-362].
Plaintiff testified that defendant's ongoing behavior since the divorce has created such an acrimonious relationship that she does not even feel comfortable on the telephone with the [*20]defendant because "I don't feel comfortable speaking with the defendant over the phone. He seems to be very aggressive to me. And often misconstrues my words. So I only discuss via e-mail or WhatsApp" [8/4/23, p. 163].
Impact of Defendant's Lawsuits and Intimidation on the Child
Plaintiff testified that defendant's attempt to control decision making extends to medical decisions and that it is "extremely difficult to get consent from the defendant on any medical issue" and that:
"[Defendant] vetoes every single thing that I try to bring about for medical decisions. I feel like he just doesn't want to do it just because I want to present it. He does, hasn't given me a sound reason why he canceled this appointment, or if he will cancel future appointments. And it is difficult to get consent, or even some, why things shouldn't be done medically [8/4/23, p. 119].
On cross-examination by defendant, the plaintiff testified that it took more than a year to get the defendant to agree to a basic adenoid surgery for the child and that she did not believe that that length of delay was in the child's best interest but that she had to wait until the defendant agreed to the surgery because she was afraid he would sue her again or sue someone else if she asserted that the child should not wait so long for the surgery. Plaintiff testified:
Q. And there was an agreement with the defendant to wait for the summer when the child was not in school for the surgery, correct?
A There was a big period in the middle where the defendant was, I am not sure what you were doing, but you were not agreeing with me. And I was afraid to bring up another issue where you will retaliate because we are in Court. You may sue somebody. So honestly, you know, the child actually had a adenoid infection, which was very severe in November, with high temperatures for several days at a time. So I preferred to do the surgery earlier. But because of the unsure nature of the anesthesia that the child was going to be under, I wasn't, didn't want to bring up another issue, because I was honestly afraid.
Q What were you afraid of?
A Retaliation from the defendant. From, you know, him, I honestly was trying to make sure the defendant is in a good mood. That he doesn't want to sue me for something else. I don't know. I am afraid of bringing up subject matter, if there are too many negative things in the defendant's life, I feel like I am the scapegoat for everything (8/10/23, p. 319].
Defendant offered no testimony about why he withheld consent to the surgery for so long or what resulted in such a long delay.
PLAINTIFF'S REQUEST
Plaintiff testified that joint legal custody is not in the child's best interest because defendant has demonstrated an inability or unwillingness to engage in good faith attempts to reach agreement on major decision, refuses to follow the protocol in the parenting agreement for trying to resolve disagreements and instead relies on intimidation and financial coercion to get his way:
Q: And do you think, how do you think it affects your child's development by you and [defendant] not being able to make joint decisions?
A My child has to wait for months or even a year to receive medical care, because the [*21]defendant doesn't want to agree or even discuss any decisions with me. He constantly tells me, "end of conversation," where I previously told you my opinion on this. He doesn't want to have discussions based on facts. And he doesn't want to go to a parenting coordinator, or listen to any of the experts that we have, being Dr. S, or Dr. K, or any other. There could be in the future arise situations with my son in his medical care or dental where things need to be done quickly and decided. And we cannot afford to go for a year back and forth, and back and forth, to try to make decisions. It is best for my son to know the direction he would go towards the future. And I want the defendant to spend quality time with his son. I do not want to take any time away from him. He will have total access to his son, as he does today. And he can enjoy his time with his child. Spend, go to the park. You know. Play games. Whatever he does. Take him to the museums. Drive him to school. He will have the same access to him as he does now. It just has to do with making decisions clear, better, and faster.
Q And if the Judge gives you sole decision-making or sole legal custody, how, would you keep [defendant] in the loop, and still notify him?
A Yes. [Defendant] will be notified of every medical, dental appointment, any communications with the teachers, any kind of decision. And I will also take his opinion into effect. And I will present him, the situations ahead of time, and allow him to participate. I would just want to have the final decision at the end of the day, so we can move on and, you know, not be constantly in limbo, I guess, thinking if, you know, will he go to school next year? Will he not go to school next year? It drags on for year after year, without making a concrete decision. And sometimes there could be situations, especially since my son has a medical condition, a brain injury, that certain decisions will need to be made faster. It sometimes takes a year for my child to get a simple medical procedure, like getting his adenoids removed. We first started the conversation in May of 2022. He just had them removed in July of 2023. It takes too long to decide simple situations based on doctor's accommodations.
Plaintiff testified on direct examination that:
Q Do you feel if the Court doesn't give you custody, it would affect your child?
A Yes.
Q How?
A I feel that the defendant drags on any major decision. At times, you know, it takes me six months to a year to make any decision. I have to tippytoe around him, make sure he feels in a good mood. And I have to be very careful with my words to present it to him when he is calm or when, and I am constantly afraid that he will retaliate, and sue me, or find, follow me, or find some other reasons to hurt me. I just feel like, I am afraid of his responses. And it is difficult to bring up any matter. [8/4/23, p. 60-61].
DEFENDANT'S POSITION
Defendant seeks for the court to deny plaintiff's request for sole legal custody and maintains that the parties can and do make joint decisions regarding the best interests of the child, in his word, "amicably" and that there are no disagreements between the parties. 
Paternal Great Grandmother: Ms. S
Defendant called the child' paternal great-grandmother as a witness and she testified, in effect, that the defendant is a wonderful father and that the plaintiff is "a bad mother. She was a bad wife" because "[s]he never ever cooked. She never did some [sic] washing. She is a liar" [3/28/24, p. 39]. When defendant questioned his witness about how the parties made decisions together since the divorce she answered that the parties have never been able to make joint decisions:
Q What decisions did you observe both the father and the mother making together after the divorce, other than the school?
A Well, there was not any decision which they agreed together [3/28/24, p. 43].
Defendant attempted to rephrase the witness's testimony, alleging that the court interpreter did not accurately interpret what was stated, and the interpreter asked for leave to rephrase the interpretation as follows:
Q What decisions did you observe both the father and the mother making together after the divorce, other than the school?
A Well, there was not a single decision they could agree upon [3/28/24, p. 44].
ATTORNEY FOR THE CHILD'S POSITION
The attorney for the child substituted judgment for the child and supported an award of sole legal custody to the plaintiff with continuation of the current parenting time schedule for the reasons started on the record.
IN CAMERA
The court held an extensive in camera interview with the child on the record with the attorney for the child present. The minutes of that in camera interview are sealed by court order.
Credibility
The court finds that the plaintiff testified candidly and credibly.
The court finds that the defendant was unwilling to testify candidly and was highly argumentative with the court, opposing counsel, and the plaintiff. The level of defendant's combativeness with plaintiff's counsel was such that the court had to take a recess to allow defendant to regain his composure at times. The court noted on the record that the court must judge the witness' credibility and that:
THE COURT: Sir, we're going to take a recess for you to think about what you're doing. You're on the witness stand. The Court is here to judge your credibility. You're argumentative. You're not letting me rule. At this point I'm going to take a brief recess for you think about how you're conducting yourself, to think about the ramifications of conducting yourself in such a way, and you shouldn't interpret the softness of my voice that I'm not concerned, okay, because I am concerned. You're not answering the questions. You're engaging in redirect from the witness stand. You're going to have an opportunity to testify in the narrative which is quite frankly a great benefit over everyone else who testifies here. But we're going to take a brief recess for you to think about this because we're not going to continue in this manner. And I must admonish you and warn you this has to stop. Thank you. [12/13/23, p. 138].
The court also had to direct the defendant to stop screaming on the record March 28, 2024 [3/28/24, p 38]. 
The court found that the child's teacher testified credibly that both parents are involved in the child's life.
The court found that the paternal great-grandmother testified in a manner that appeared heavily coached and designed to bolster the defendant's position and that her testimony was not candid and that it appeared that the defendant attempted to elicit testimony of facts that he had shared with her.
The court found that the testimony elicited by the defendant from his childhood friend focused merely on things that the defendant had told him which, it was clear, did not include many of the facts related to this litigation including that the defendant had sued the plaintiff alleging that she gave him a venereal disease.

The Law
It is well-established that joint custody can be upheld where "although there [was] some antagonism between the parties and difficulties in communication . . .the best interests of the children would be served by joint custody." (Franklin v. Franklin, 199 AD3d 758, 760 [2 Dept.,2021]). In Franklin, the court stated that the parties "ultimately came to mutual agreements despite initial disagreements" and that the parties were "able to come together for most decisions regarding the children." Id.
It is also well-established that joint custody is "insupportable where the parents were so severely antagonistic and embattled that such award could only enhance family chaos" Braiman v. Braiman, 44 NY2d 584, 584 [Ct. of App. 1978]. Where, as here, a party seeks modification of an existing court-ordered custody arrangement they must "show the existence of such a change in circumstances that modification is required to ensure the continued best interests of the child." (Matter of Connell-Charleus v Charleus, 192 AD3d 890, 890, 140 N.Y.S.3d 752 [2 Dept.,2021]). Such a change in circumstances warranting modification will exist "when the relationship between parents becomes so acrimonious that it precludes opportunity for joint decision-making, the Court is within its rights to exercise its discretion to award sole custody to one of the parties." (Cywiak v. Packman, 214 AD3d 654, 184 N.Y.S.3d 167 [2 Dept.,2023]).
The Second Department has consistently held that a deterioration of "meaningful cooperation [and] communication" can support a finding that joint custody is no longer appropriate (Gold v. Khalifa, 223 AD3d 803, 804 [2 Dept.,2024]; see also Zambas v. Condon, 227 AD3d 729, 731 [2 Dept.,2024]); see also Robinson v. Mustakas, 214 AD3d 880, 881 [2 Dept.,2023]).
" 'Modification of a court-approved stipulation setting forth the terms of custody is permissible only upon a showing that there has been a sufficient change in circumstances such that modification is necessary to ensure the best interests and welfare of the child' " (Cywiak v Packman, 214 AD3d 654, 656-657 [2 Dept.,2023] quoting Baraz v. Polyakov, 198 AD3d 853, 854, 156 N.Y.S.3d 298; see also Matter of Burke v. Squires, 202 AD3d 784, 785, 162 N.Y.S.3d 434); see also Matter of Connell—Charleus v. Charleus, 192 AD3d 890, 890, 140 N.Y.S.3d 752 [2 Dept.,2021]).
In reviewing whether a change of custody was in the child's best interest the Second Department has consistently held that the trial court is "in the best position to evaluate the credibility of the witnesses and its determination should not be disturbed unless it lacks a sound [*22]and substantial basis in the record" (Matter of Gold v. Khalifa, 223 AD3d 803, 804, 204 N.Y.S.3d 147 [internal quotation marks omitted]; see also Eschbach v. Eschbach, 56 NY2d 167, 173—174, 451 N.Y.S.2d 658, 436 N.E.2d 1260 [1982]).
"[J]oint custody is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion" (Matter of Robinson v. Mustakas, 214 AD3d 880, 880, 185 N.Y.S.3d 302 [2 Dept.,2023] [internal quotation marks omitted]).
"Evidence of a hostile relationship between the mother and the father indicating that joint decision-making is untenable is a change of circumstances" (Matter of Pierce v. Caputo, 214 AD3d 877, 878—879, 185 N.Y.S.3d 283 [2 Dept.,2023]). "A change from joint legal custody to sole custody by one parent is warranted where the parties' relationship is so acrimonious that it effectively precludes joint decision-making" (Matter of Schweizer v. Jablesnik, 95 AD3d 1341, 1342, 944 N.Y.S.2d 891 [2 Dept.,2012] [internal quotation marks omitted]; see Matter of Connell—Charleus v. Charleus, 192 AD3d at 891, 140 N.Y.S.3d 752 [2 Dept.,2021]).
The Second Department also held in Zambas v, Condon that where that "the evidence showed that the father's demonstrated inability to cooperate with the mother on matters concerning the child" and where "the father appeared to be guided by his anger toward the mother rather than the child's well-being" there was a sound and substantial basis in the record to change the parties' joint custody agreement to award the mother sole legal custody (Zambas v. Condon, 227 AD3d 729, 731 [2 Dept.,2024]; see also Vizueta v Wiley, 226 AD3d 797 [2 Dept.,2024]).
It is well established that the court's discretion, when seeking to determine custody, "is dependent in large part upon its assessment of the witnesses' credibility and upon the character, temperament, and sincerity of the parents... [and] will not be disturbed if supported by a sound and substantial basis in the record" (Matter of Connell-Charleus v Charleus, 192 AD3d 890, 891 [2 Dept.,2021]).
The court may consider factors to support its finding of whether or not a modification in custody is in the child's best interest, including "(1) the original placement of the child, (2) the length of that placement, (3) the child's desires, (4) the relative fitness of the parents, (5) the quality of the home environment, (6) the parental guidance given to the child, (7) the parent's financial status, (8) his or her ability to provide for the child's emotional and intellectual development, and (9) the willingness of the parent to assure meaningful contact between the child and the other parent." (Anonymous 2011-1 v. Anonymous 2011-2, 136 AD3d 946, 948 [2 Dept.,2013]).
Here, the testimony at trial showed that the parties' "relationship [has] deteriorated to a point where there was no meaningful communication or cooperation between them for the sake of the child." Gold v. Khalifa, 223 AD3d 803, 804 [2 Dept.,2024]; see also Matter of Chery v. Richardson, 88 AD3d 788, 789 [2011]) and that "[t]he continued deterioration of the parties' relationship is a change in circumstances warranting a change in the joint legal custody arrangement." (Matter of Robinson v. Mustakas, 214 AD3d 880, 881 [2023]). 
Here, the defendant's actions in this case are similar to those of defendant in Robinson, in which the Second Department held that the "continued deterioration of the parties' relationship is a change in circumstances warranting a change in the joint legal custody arrangement" and that "sole legal custody to the mother was in the child's best interests." (Matter of Robinson v. Mustakas, 214 AD3d 880, 881 [2d Dep't 2023]). In Robinson, the father "habitually insulted and [*23]belittled the mother[,]" was "guided by anger toward the mother rather than the child's well-being[,]" and demonstrated a general "inability to [make] appropriate decision for the child." Id.
It is clear to this court that the defendant loves the child and that the child loves both parents. The court recognizes that the defendant's intention is not to hurt the child; however, despite the defendant's devotion to the child, it is also evident that the defendant's utter disdain and complete disregard for the plaintiff overrides any ability he may have to share joint custody with her and that his prioritization of attempting to control the plaintiff makes him unable or unwilling to make decisions in the child's best interest. Defendant has no insight into the effects of his behavior and positions on his ability to effectively co-parent.
Defendant uses his law license and knowledge as an attorney to exert power, control and economic coercion and fear of retaliation while berating the plaintiff for allegedly "wasting" money by hiring an attorney. Defendant's repeated pattern of suing plaintiff's attorneys and/or files grievances against them, which plaintiff contends he does in the hope they will abandon representation of her, is disturbing and reprehensible.[FN18]

He unabashedly conceded at trial that he refuses to abide by the terms of the parties' parenting agreement related to how disagreements on major decisions will be addressed claiming that the terms the parties agreed to were, in effect, irrelevant because he "knows better" and that it somehow should reflect poorly on plaintiff for her to seek to enforce the parties' agreements. 
Testimony established that the defendant has repeatedly engaged in behavior designed to embarrass the plaintiff such as by instituting a proceeding accusing her of transmitting the herpes virus to him using her name but not his; claiming she lacks the intelligence requisite for adequate sole decision making based upon her education level; and having his girlfriend serve her legal documents at the child's soccer event. These are not actions of a parent whose primary motivation is the best interest of the child and demonstrates a level of acrimony by the defendant towards the plaintiff that makes it difficult to find that continuing joint legal custody is in the best interest of the child.
During the less than four (4) years since the parties entered into the parenting agreement they have, unfortunately, faced the need of making many major decisions related to the child, including serious medical decisions related to the child's brain trauma injury as a result of being hit by a car in October 2020 but defendant's desire to control the plaintiff has made that nearly impossible. While asserting that there is no basis to change joint custody, the defendant conceded at trial that the parents have not been able to agree on any major issue that has come up since they entered into the parenting agreement in November 2019: they were unable to agree on dental treatment; school; tutoring; vaccinations; camp; surgery; or even extracurricular activities. The evidence and credible testimony reflects that the inability to agree rests almost in every instance on the defendant attempting to coerce the plaintiff in to relenting to his will. The evidence and credible testimony also show that defendant had consented to the child being vaccinated against COVID-19 and finds the plaintiff's explanation for why she moved the vaccination up a few weeks based upon the subsequent New York City mandate for children to be vaccinated to participate in certain activities that both parents enjoyed with the child was credible.
[*24]Non-compliance With Parenting Agreement
The court notes that even during the unfortunate medical situation the parties faced when the child suffered a traumatic brain injury after being hit by a car the defendant used it as an opportunity to criticize the plaintiff and was unable to put his disdain for her aside to cooperate when the plaintiff asked him to use the parenting coordinator.
Defendant's unilateral determination that using a parenting coordinator to resolve disagreements was a waste of time and money was not his decision to make and his position that judicial intervention was also "unnecessary" because whatever decision he wanted for the child was in the child's best interest and, therefore, any position taken by the plaintiff was evidence that she lacked his greater insight, is also misplaced.
Defendant's Disregard for Child's Relationship With Plaintiff
Defendant offered no testimony regarding any positive attributes of the plaintiff or in support of maintaining her relationship with the child. His approach is that major decisions must be made according to his choice and that any attempt by plaintiff to assert an opinion inconsistent with his is met with intimidation in the form of stonewalling, financial coercion and/or weaponization of his license to practice law against her to overwhelm her time and strained financial resources so that she must give into him while he, as an attorney licensed to practice law, does not have the same financial burden from ongoing litigation because he can and does write, file and argue his own applications.[FN19]

In addition to assessing the acrimony between the parties the court must assess each parties' willingness and ability to cultivate the child's relationship with the other parent. The defendant loves the child deeply and the child has a lovely relationship with both parents; however, defendant is unable or unwilling to recognize the impact of his utter lack of respect and his aggressive bullying of plaintiff can have on the child and how that can jeopardize the child's relationship with her. Defendant is so blinded by his own narrative of intellectual superiority that he has been unable or unwilling to understand the possible negative impact his retributive tactics may have on the plaintiff's ability to provide care for the child and the quality of child's relationship with plaintiff.
Defendant has engaged in a course of conduct towards plaintiff in public that does not foster the relationship between the child and the plaintiff and he undermines plaintiff's autonomy during her parenting time which clearly interferes in the plaintiff's parenting time and places her in an impossible situation where she either must go along with the defendant or disappoint the child: these are not the actions of a parent who respects the other parent or whose primary intention is cultivating the child's relationship with the plaintiff. The case law is clear that one [*25]factor in awarding custody is which parent will foster the child's relationship with the noncustodial parent: here, that is clearly the mother who has overall consistently shown an extraordinary willingness to include the father in decision making and attempted to co-parent with him despite his extreme disrespect for her and unwillingness to abide by the decision-making protocols in the parties' parenting agreement (see Cornielle v Rosado, — NYS 3d —, 2024 WL 4446713 [2 Dept., October 9, 2024]; see also Hasse v Jones, 230 AD3d 774 [2 Dept.,2024]).
Financial Coercion
Defendant asserted during trial that the financial impact of the conflict between the parties is irrelevant to the issue of custody. While the specifics of financial conflict between the parties is not the subject of this custody trial, under the facts presented this court must consider the defendant's behavior in using his greater financial resources as a tool of coercion against plaintiff in this litigation and what that choice reflects about his ability and/or willingness to share joint custody with the plaintiff. The court must consider whether a parent who chooses to wield financial coercion to get their way is focused more on winning a dispute with the other parent or in the best interest of the child, especially where that parent does so while also refusing to comply with the terms of the parenting agreement.
Under the facts presented, this court does not adopt defendant's theory that any consideration of finances is irrelevent: here, testimony established that defendant has consistently used financial coercion to attempt to force the plaintiff to acquiesce to his preferences instead of using the protocols in the parenting agreement. This demonstrates a high level of acrimony and showed that defendant is unwilling or unable to participate in joint custody. 
Defendant appears unable or unwilling to understand that his unilateral attempts to control the plaintiff to get his way on decision making ultimately put the burden on the child and that plaintiff's willingness to extend herself to, in effect, "cover" for the defendant when he changes his mind has been the only buffer the child has from the impact of the defendant's unilateral action and the only thing that has provided some of stability for the child. Here, defendant appears more to be basing his decision making for the parties' child by prioritizing the financial impact on his new family over the best interest of the parties' child often asserting, for example, that continuing the child in the private school he has attended since 2019 is no longer in the child's best interest not primarily because he does not believe that the child is thriving there but largely because he asserts that the financial cost is onerous given the new expenses he has related to starting a subsequent family. In fact, defendant criticizes plaintiff primarily because he believes that when she assesses the best interest of the child the parties share that she should be more "sensitive" to the impact on the child he subsequently had in another relationship. The defendant's intention appears more focused on this new family than on the best interests of the parties' child and that the plaintiff is the parent who is prioritizing the best interests of the parties' child.
More insidious is that it appears that defendant wants the benefit of the child continuing in many of the options plaintiff proposes — such a private school — but he does not want any of the related financial obligation so he manipulates situations where the child starts a school or activity and begins to enjoy the benefit of the experience and then defendant, under guise of changing his mind, tries to avoid any corresponding financial obligation by withdrawing his agreement only to then to say, in effect, "it is okay if YOU want the child to stay in private [*26]school or that extracurricular activity but then YOU have to pay the full cost" all while putting the plaintiff in an impossible position with the child who has already started the school or activity.
Plaintiff Protecting Child's Relationship With Defendant
It is also clear that the plaintiff has taken extraordinary care to protect the child's relationship with the defendant despite the turmoil defendant's behavior has put her through. Plaintiff has steadfastly placed the child's relationship with the defendant ahead of any personal conflict she has with the defendant. The court found the plaintiff's testimony candid and credible that she has often engaged with defendant in ways she otherwise would not want to in order to shield the child from the disputes between the parties.
Plaintiff testified during her direct examination that the defendant is an involved and loving father. She testified credibly throughout this litigation that she does not seek to interfere or to limit the child's time and enjoyment of his father and there was no testimony at trial that would indicate that she has been anything but respectful of the defendant and the child's relationship with him. Plaintiff has maintained that she only seeks final decision making on major parenting decisions for the child because the defendant refuses to abide by the parties' parenting agreement making true joint custody and decision making impossible.
Here, having considered all the testimony at trial, the court finds that the level of acrimony by the defendant towards the plaintiff transcends any level that would make continuing joint custody in the best interest of the child. The tactics defendant uses against plaintiff to get his way often place the child in limbo, included having to see numerous dentists before getting cavities fills; waiting for necessary medical treatment; creating what appears to have been an avoidable delay in ensuring the child had no break in health insurance coverage after the plaintiff lost her employment; and situations that bring the parties' dispute into the child's educational environment such as unilaterally e-mailing the school that the child would be leaving for public school when the plaintiff had not agreed to the change. The court finds credible the plaintiff's testimony that defendant's refusal to follow the parenting agreement results in situations that are not in the child's best interest.
Award of Sole Legal Custody to Plaintiff
Defendant's blatant and unapologetic refusal to abide by the parenting agreement and his vindictive, retaliatory behavior against plaintiff anytime he does not get what he wants makes it impossible for this court to continue joint legal custody: to do so would not be in the child's best interest because of the extreme level of acrimony by the defendant toward the plaintiff. Defendant refuses to consult with the plaintiff or to attempt to resolve disagreements using the protocols detailed in the parenting agreement and has, instead, maintained a recalcitrant campaign to get his way. There is no testimony before the court that defendant understands the impact of his behavior or that he would change that behavior. 
The record established that plaintiff has consistently kept the defendant informed of issues related to major decisions involving the child and that she has sought his input on major decisions. The court found credible her testimony that she would continue to do so if awarded sole legal custody. The court finds that the plaintiff has persistently attempted to obtain defendant's compliance with the parenting agreement for years and that all her many efforts have been rejected by the defendant. 
The court finds that it is in the best interest of the child to award sole legal custody to the plaintiff. She shall consult with the defendant on all major decisions related to the child but she [*27]shall have final decision making. 
Continuation of Parenting Schedule
The court recognizes and acknowledges that this child is fortunate to have two parents who love him very much and who are very involved in his life. It is undisputed that the child enjoys his time with both parents. It is undisputed that, despite his trial position that he does not want the child to continue in private school because of the cost, the defendant has been very active in the child's private school and the court finds the defendant's testimony credible that he does, in effect, many wonderful activities with the child. This court's assessment that the defendant is unable or unwilling to engage with the plaintiff in a manner that makes continued joint custody in the best interest of the parties' child includes no finding that he is not equipped to make day-to-day decisions for the child when he has parenting time. 
Plaintiff testified that she wants the child to continue to enjoy the same parenting time he currently enjoys with the defendant. The attorney for the child joined in the request to continue the current parenting schedule. As such, the court makes no changes to the parenting time agreement agreed to between the parents in their parenting agreement: at this time, the child shall continue to enjoy the existing parenting time with both parents as detailed therein. 
Private School
The issue of whether the child should continue in the private school was also referred to this court and while the court herein granted the plaintiff sole decision making the court specifically grants the plaintiff's request to continue the child's enrollment in the private school. 
Based upon the testimony provided, it is undisputed that the parties enrolled the child in the private school for pre-kindergarten and that they conferred and agreed to enroll the child in the private school for kindergarten and that the child has continued to attend that private school for the next few years and it is the only school the child has ever attended. While defendant now appears to say he has changed his mind about the private school the court notes that during this litigation he actually sought contempt against the plaintiff for allegedly considering withdrawing the child from the private school. Defendant himself called the child's homeroom teacher to testify on his direct case about how involved and supportive he is of the child in the private school: he appears to have no objection to the child continuing in the school, of course, if plaintiff pays for the school. It is also undisputed that the defendant refused to comply with the parties parenting agreement protocol to use the parenting coordinator when he allegedly wanted to move the child to public school. The protocol for seeking a change of the child's school was not complied with and defendant did not seek an order of the court to remove the child to public school and the parties' stipulation of settlement clearly indicates that the parties contemplated private school as a possible option for the child. The stipulation of settlement provides, as relevant here:
"The parties agree that in the event their Child should be enrolled in private school, the parties shall be equally responsible for private school tuition" (JN #1, p. 26).
The plaintiff testified credibly and with good and sufficient reasons why she believes it is in the child's best interest to continue enrollment in the only school he has ever been enrolled in. Based on all the foregoing reasons, the plaintiff's application that she have sole decision making, including on all major decisions related to education and whether the child should remain in the current school is granted.
The parties' financial obligation for the cost of that tuition shall be according to the terms of their stipulation of settlement.

 Conclusion
The court notes that the mother has gone out of her way to avoid confrontation at great personal and financial cost clearly because she places the best interests of the child above her own self-interest or convenience. Even during this litigation, the mother did not denigrate the father and his love for the child and the child's love towards him. The mother actively strives to foster the relationship between the child and the father. The mother's credible attempts to shield the child from the father's hostility towards her and his vocal denigration of her as a parent are noted.
No one should be subjected to such an onslaught of power designed to leave her without counsel without adequate financial resources to take care of the child and to insult her intelligence because she is not a lawyer. The father's disdain for the mother paying her counsel while at the same time he utilized his legal skills was palpable throughout the proceeding. The father withheld financial support for more than a year and then — incredibly  criticized her for starting the post-judgment litigation seeking enforcement is more any parent should have to endure in the name of joint custody. 
The father's steadfast refusal to participate in the contractually agreed upon parent coordination process because he has since unilaterally changed his mind about whether a parenting coordinator makes financial sense when that was the protocol agreed upon in the original joint custody agreement makes it clear that joint custody is no longer viable: the father's consistent insistence that he should be able to "override" the terms of the custody agreement when he wants to because he believes he is, in effect, "smarter" than the mother has demonstrated that he does not respect the mother as a parent and that he will not make joint decisions with her. His definition of consultation and agreement is predicated upon a process of, in effect, asserting that he will not pay or refuses to consult with her on major decisions without long term angst and confrontation until he gets his desired outcome when the mother either pays or surrenders to his will to avoid putting the child in untenable positions. The father asserts that he communicates with the mother but he refuses to consult with her and rather dictates what will happen and attempts to force her to acquiesce: that is not the behavior of a parent who is able or willing to exercise joint custody.[FN20]

Plaintiff's application for an award of sole legal decision-making is granted. She shall consult with the defendant on all major decisions related to the child, but she shall have final decision making and the defendant shall not interfere. The prior schedule of parenting time shall continue.
This shall constitute the decision and order of the court.
ENTER:
HON. JEFFREY S. SUNSHINE
J.S.C.

Footnotes

Footnote 1:In a prior published decision, the court granted the defendant's application [motion seq. #13; NYSCEF #466] that the cost of the transcripts being paid equally (50/50%) by the parties [Faina P. v. Alexander S., 80 Misc 3d 1208(A) [August 16, 2023; 3/28/24, p. 78]; however, thereafter defendant has been recalcitrant in delaying payment for his share of the cost of the transcripts arguing, contrary to his application, that the plaintiff should pay for the full cost representing on the record that if he was required to pay his share of cost for transcripts that he would not pay his child support. The court has repeatedly had to direct the defendant of his obligation to pay his share of the transcripts and that he cannot attempt to control the timing of the court's decisions based upon withholding payment for the transcripts.

Footnote 2:There are four (4) pilot parts located around New York State that permit this practice at this time but none of them are in Kings County.

Footnote 3:Routinely numerous motions were pending at the same time with defendant filing numerous applications seeking the same or similar relief, primarily seeking to, in his words "vacate" his child support obligation under a variety of theories, including that if he was found in contempt for failing to pay child support that it could jeopardize his license to practice law.

Footnote 4:The court denied this argument finding that plaintiff's alleged extramarital conduct during the marriage was irrelevant to plaintiff's application to enforce child support obligation in final judgment of divorce, defendant's petition to terminate child support, and the parties' cross-motions for contempt noting that any issues of marital fault were disposed of when parties entered into stipulations of settlement and when judgment of divorce was signed and entered and had no bearing on defendant's obligation and alleged refusal to pay direct child support in compliance with the voluntary terms agreed to by the parties in their stipulation of settlement which was incorporated by not merged into the judgment of divorce.

Footnote 5:In vacating the contempt finding based upon a scrivener's error in the judgment of divorce the noted that "given the extreme remedy of contempt and the potential impact of the contempt finding on defendant who is an attorney and in the interest of justice" [Faina P. v. Alexander S., 78 Misc 3d 1225[A][March 30, 2023] based upon a scrivener's error in the judgment of divorce that was inconsistent with the clear terms of the parties' stipulation of settlement.

Footnote 6:The court denied defendant's argument that his basic child support obligation which he consented to in the stipulation of settlement should be modified nunc pro tunc back to the date of the stipulation of settlement even though he conceded that at the time of his application for downward modification he earned more income than he did at the time he voluntarily entered into the stipulation of settlement.

Footnote 7:This was when he stopped paying direct basic child support to the plaintiff and would later be one of his many arguments about why he was not required to pay child support: that payment toward private elementary school should off-set his basic child support obligation.

Footnote 8:In that enforcement litigation the defendant took the position that he had no basic child support obligation independent of his contribution to private school so for some time he paid one-half (50%) of the private school tuition while effectively "docking" it from his basic child support obligation which, among other non-compliance with the judgment of divorce, resulted in plaintiff filing an enforcement application.

Footnote 9:Defendant previously filed an order to show cause for contempt against plaintiff seeking an order that she keep the child in the private school. Defendant's objection to the private school appears primarily linked to cost. Defendant testified both that he finds the academics too rigid and that he does not think that the teachers are very good; however, his overall position regarding the school appears to be that he supports the child attending but only as long as plaintiff will 100% pay for it instead of the parties equally sharing (50/50%) the cost of private school.

Footnote 10:The court previously addressed defendant's applications for downward modification in written decisions. Those applications were denied after the court determined inter alia that the defendant earned more at the time of the application for downward modification than he did at the time the parties entered into the stipulation of settlement.

Footnote 11:This court in denying defendant's prior applications for downward modification has previously found that there had been no change in circumstances and that defendant made more income as of the date of his application then when the parties' entered into the stipulation of settlement in November 2019.

Footnote 12:The first day the witness was experiencing technical difficulties that made it impossible to proceed. The defendant recalled this witness and the court heard the testimony.

Footnote 13:Name of counsel/law firm redacted.

Footnote 14:Name of counsel/law firm redacted.

Footnote 15:Name of counsel/law firm redacted.

Footnote 16:Name of counsel/law firm redacted.

Footnote 17:Name of counsel/law firm redacted.

Footnote 18:The court notes that during this litigation the defendant filed an order to show cause seeking for the court to recuse itself from this matter. That application was denied.

Footnote 19:There is a pending counsel fee application in which plaintiff seeks an award of more than $100,000.00 in counsel fees she alleges she has incurred in the post-judgment enforcement applications because, she contends, unlike the defendant, she is not an attorney and has been forced to incur counsel fees to continue in this litigation while defendant uses his license to practice law to continue in his ongoing efforts to "terminate" his child support obligation by, in effect, retroactively voiding the parties' stipulation of settlement or forcing her to acquiesce to his demands because she can no longer sustain the cost of this litigation he can continue to pursue as a result of his law license.
Footnote 20:He later asserted that "two heads" are "always" better than one especially where he was a lawyer but he was unable or unwilling to acknowledge that the mother's insights and input was relevant or equally valuable.